# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KEONDRE EARL SOLOMON,

Defendant-Appellant.

UNPUBLISHED
March 10, 2015

No. 319248
Saginaw Circuit Court
LC No. 13-038289-FC

Before: JANSEN, P.J., and METER and BECKERING, JJ.

PER CURIAM.

Defendant appeals as of right from his convictions, following a jury trial, of two counts of assault with intent to murder, MCL 750.83; three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b; and one count of carrying a dangerous weapon with unlawful intent, MCL 750.226. He was sentenced to prison terms of 276 months to 40 years for assault with intent to murder, 30 months to 5 years for carrying a dangerous weapon, and 2 years for felony-firearm. The felony-firearm sentences are concurrent with each other but consecutive to the assault-with-intent-to-murder and carrying-a-dangerous-weapon sentences. For the reasons explained below, we affirm.

## I. BACKGROUND

This case involves the drive-by shooting of Marcel Wilson and Richard Fowler. Wilson and Fowler were driving from the west side to the south side of Saginaw, which was where Fowler lived. At one point they stopped at a gas station. Fowler went into the store while Wilson stayed in the car. While waiting, Wilson noticed defendant pumping gas into a white Dodge Charger. Fowler testified that he went into the store, made a purchase without talking to anyone, and walked straight out. Videotape surveillance footage from the store confirmed that Fowler "ma[de] his purchase and walk[ed] out without any interaction with anyone." The footage also showed that defendant and a man named J'ion Parker left the store after Fowler.

Wilson testified that as he and Fowler proceeded toward the south side of town, he noticed the Charger coming up behind them, eventually pulling up alongside them. According to Wilson, "that's when it started shooting." Fowler said he and Wilson both tried to duck when the shooting began, but that "there wasn't no stopping them." The emergency room doctor who attended to Wilson and Fowler testified that Wilson had been shot twice and Fowler had been

-1-

shot once. Both men needed hospitalization and surgery. A witness testified that the car in which Wilson and Fowler had been traveling hit a tree and the Charger hit a fire hydrant.

Saginaw Police Officer Matthew Gerow interviewed Parker at the police station. Gerow testified that although Parker was "very reluctant" and "definitely did not want to be there," he identified a picture of codefendant Samuel Jackson as the shooter and indicated on a piece of paper that both defendant and Jackson were involved. Gerow also testified that there was a hidden camera and microphone in the interview room, and that at one point when Parker and his mother were alone, the camera recorded Parker whispering to her, "I can't live my life as no snitch, though. I can't do it. It would make me want to kill myself if I was a snitch. They gonna kill me if I snitch." The trial court provided the following limiting instruction regarding Parker's statement: "That's been offered to explain why the witness may have been reluctant with the police, and there may be an issue of credibility as to that witness. And so you may consider the evidence as to the witness credibility." The trial court further explained that "[t]here is no evidence of threats of any kind by either of the defendants here, or of threats or intimidation of any kind, by them or anybody associated with them."

Gerow also testified regarding a map of Saginaw that was admitted as a trial exhibit. The map contained annotations indicating where each of the involved parties lived, where the gas station was, and the location of the shooting. Gerow stated that defendant and Parker resided in what would be considered the east side of Saginaw. Gerow testified that he was aware of conflicts between individuals from different parts of the city, and that he had encountered "assaultive-type cases" between individuals from the east and south sides. Gerow then stated that hand gestures made by Jackson and Parker in photographs taken from Parker's Facebook page demonstrated their association with the east side and Jackson was making gestures showing disrespect for the south side. Gerow made it clear that none of the pictures admitted showed defendant displaying hand gestures that would associate him with a particular side of the city. The trial court stated to the jury:

. . . there was a reference to some assaultive acts on these different parts of town or between these different people associated with these different parts of town.

I caution you that there's nothing in evidence to suggest that these two defendants were involved in these other acts that were referred to by the witness, and -- or that these two defendants were associated in any way with those other acts that were referred to by the witness.

## II. STANDARD OF REVIEW

"The decision to admit evidence is within a trial court's discretion, which is reviewed for an abuse of that discretion." *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). "An abuse of discretion occurs . . . when the trial court chooses an outcome falling outside [the] principled range of outcomes." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "Preliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, are reviewed de novo . . . ." *Bynum*, 496 Mich at 623.

## III. ANALYSIS

Defendant first argues that the trial court erred in admitting evidence of his membership in a gang because such evidence was irrelevant and unfounded. "The Michigan Rules of Evidence provide the appropriate framework" for reviewing whether a defendant "is entitled to a new trial on the basis of evidentiary error." *Id*. at 623-624. "Evidence which is not relevant is not admissible," MRE 402, and relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice," MRE 403. "In the context of gang-related violence, . . . expert testimony may be admitted regarding general characteristics of gang culture for an appropriate purpose, such as helping to elucidate a gang member's motive for committing a gang-related crime." *Bynum*, 496 Mich at 626-627. "The testimony, of course, must otherwise meet the rules of evidence before it can be admitted," and an expert may not testify that "on a particular occasion, a gang member acted in conformity with character traits commonly associated with gang members." *Id*. at 627.

The premise of defendant's argument is inaccurate, rendering it without merit. Neither Gerow nor any other witness testified that defendant or any of the involved parties were members of a gang and, unlike in *Bynum, id*. at 616, there was no testimony that defendant acted in conformity with the characteristics of a gang or other group. Rather, Gerow testified that, based on his experience as a Saginaw police officer, he was aware of "assaultive-type" conduct and animosity between residents of the city's east and south sides, and that defendant and Parker resided in what would be considered the east side of town. Also, although Gerow opined that Jackson and Parker—but not defendant—were seen in pictures displaying hand gestures indicating an association with the east side and disrespect for the south side, he did not opine that there were gangs in these areas or that defendant, Jackson, or Parker were members of any gang. Further, the trial court mitigated any unfairly prejudicial impact of this testimony by instructing the jury that "there's nothing in evidence to suggest that these two defendants were involved in these other acts [i.e., the historically observed "assaultive-type" conduct] . . . or that these two defendants were associated in any way with those other acts . . . ." "It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Moreover, defendant fails to explain why evidence of his residence on the east side of Saginaw was irrelevant. Evidence that defendant resided on the east side of Saginaw was relevant in explaining why he was willing to participate in an apparent random act of violence against two people whom he did not know, but whom he saw traveling toward the south side of Saginaw. Accordingly, defendant has failed to show that he was convicted on the basis of evidence that was irrelevant or unfairly prejudicial.

Next, defendant argues that the trial court erred in admitting evidence regarding Parker whispering to his mother, "I can't live my life as no snitch, though. I can't do it. It would make me want to kill myself if I was a snitch. They gonna kill me if I snitch."

At trial, certain incriminating statements from Parker's preliminary examination were admitted. Parker invoked his right to remain silent when called as a witness at trial, stating he did not want to testify. The trial court appointed Parker counsel to advise him regarding his Fifth Amendment rights, and his appointed counsel thereafter informed the court that Parker had no memory of what happened and did not want to testify. The court declared Parker unavailable and permitted his preliminary examination testimony to be read into the record.

-3-

At the preliminary examination, Parker testified that he was traveling in a car with defendant and Jackson on the night in question, but he denied that he saw Jackson shoot a gun. Parker testified that when he, Jackson, and defendant left the gas station, they attempted to pass a slow-traveling vehicle and crashed when that vehicle bumped their vehicle. He testified that he did not know whether someone in his car's front seat began shooting and that he heard shots only after he got out of the car following the crash and began running home. Parker admitted, however, that he had previously told a police detective that Jackson began shooting at another vehicle while he (Parker) was sitting in the backseat and defendant was driving.

Given Parker's conflicting statements, his credibility was highly relevant. "[T]he credibility of a witness is an issue of the utmost importance in every case," and "evidence of a witness' bias or interest in a case is highly relevant to his credibility." *People v Mumford*, 183 Mich App 149, 152; 455 NW2d 51 (1990) (citation and internal quotation marks omitted). Evidence that Parker stated before his preliminary examination that he did not want to "snitch" was highly probative regarding this credibility.

Defendant complains that notwithstanding the relevance of Parker's reluctance to talk with police, the probative value of the phrase "[t]hey gonna kill me if I snitch" was substantially outweighed by the danger of unfair prejudice under MRE 403 because it suggested that Parker had been threatened. Defendant also argues that reversal is warranted because the prosecutor did not introduce evidence connecting the threats to defendant.

As discussed, the phrase "[t]hey gonna kill me if I snitch" was highly relevant in this case, because it spoke directly to Parker's potential bias. Moreover, contrary to defendant's assertion, the statement did not have an unfairly prejudicial effect because it did not demonstrate that any threats were made against Parker. Indeed, Parker did not say that anyone told him he would be killed if he snitched, let alone that defendant did. Rather, his statement merely reflected his opinion, however informed or exaggerated. Moreover, the trial court mitigated any possible prejudicial impact of Parker's statements by instructing the jury that "[t]here is no evidence of threats of any kind by either of the defendants here, or of threats or intimidation of any kind, by them or anybody associated with them." See *Graves*, 458 Mich at 486. Accordingly, the trial court did not err in admitting Parker's statements.

Affirmed.

/s/ Kathleen Jansen
/s/ Patrick M. Meter
/s/ Jane M. Beckering